Good morning. We have four argued cases today. The first of these is number 15-1717, East Coast Sheet Metal Fabric Caterers v. Autodesk, Inc. Mr. Summerfield. Oh, I'm sorry. We have one piece of business before we get to the cases, and that is Judge Hughes has a motion. I have an admission this morning. I'm happy to move the admission of my clerk, Keith Syverson, who's been a great clerk for the last year and a half. I'm sad to see him go, but happy to see him restart his career in patent litigation and also happy that he gets to move back to his home state of Massachusetts. So I move the admission of Keith Syverson, who is a member of the Bar and is in good standing with the highest courts of Virginia and the District of Columbia. I have knowledge of his credentials, and I'm satisfied that he possesses the necessary qualifications. Your motion is granted, Judge Hughes, and Mr. Syverson will be welcomed into the Bar of the Court. Judge Redmond, you solemnly swear or affirm that you will comport yourself as an attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America. Welcome to the Bar of the U.S. Court of Appeals for the Federal Circuit. Thank you. Thank you. Now, Mr. Summerfield. Thank you, Your Honor. May it please the Court. When I was considering today the question, what is an abstract idea? Mr. Summerfield, just to maybe eliminate some stuff, do you concede step one of Alice? No, Your Honor, we don't. We argued it below as we state in our reply brief. There was a section of equal length on summary judgment that argued why the subject claim satisfies step one of Alice in addition to step two. Why isn't this just computerizing blueprints that would satisfy the first, would be an abstract idea in the first step of Alice? Your Honor, it depends on what the definition of abstract idea is. And this has been, I believe, a problem in the jurisprudence, that there is no concrete way of measuring what an abstract idea is. Up till now, what litigants have done. Well, there are plenty of cases saying that if you take something that was known to be able to be done without a computer before and you computerize it, that you've satisfied step one of Alice. There may be at the second step of Alice that there's an invention that will make it a patentable subject matter. But at the first step, if all you do is take something that was done earlier with pen and pencil and computerize it, that's an abstract idea. But, Your Honor, in the first place, this patent isn't simply taking something that was done manually and computerizing it. As the background section of all the patents say, the prior art itself was a method of computerized drawing. This takes a problem that existed in the prior art, how to convert. That was all automating human steps. I mean, just because you're a second generation automation doesn't get it out of step one of Alice. It may get it out of step two because you're solving a computer problem, but it doesn't get it out of step one, does it? Just because you're improving on some patent that itself would probably be ineligible under Alice. We believe so, Your Honor. We believe that it satisfies step one and step two. I don't understand the response to that. Let's assume this prior art that you're relying on, which is computerized drawings and blueprints and things like that, is patent ineligible. Because you've improved on it, that somehow renders it non-abstract under step one? Yes, Your Honor, because it's still solving a problem that existed in the computer world. That's step two. Your Honor, again, with respect, I think part of the issue up until now has been because there is no definition of what an abstract idea is. Well, the definition at least is if you take human steps and do them on a computer, that's abstract. Your Honor, I know that that's not necessarily fitting the most technical definition of abstract, but it seems that that's what the Supreme Court has said, and that's what we've said, and we have to follow that precedent. Well, Your Honor, but if we look at what Supreme Court precedent talks about, if we go back to the Morse case and the telephone cases, since then, the common theme through all of these cases, irrespective of what the technology is, is that a patent cannot co-opt a basic tool of research. Suppose you were the first one to computerize blueprints. Would that be an abstract idea? I believe it depends on what else the claim says, Your Honor. But try to answer my question. In this case, if we didn't have any computerized blueprints beforehand, and you were the first one to computerize blueprints, would that be an abstract idea under the first step of Alice? If that were the hypothetical claim, simply computerizing blueprints, then that would be an abstract idea, because all you're doing now is purely computerizing something. But again, going back to how step one is analyzed. So why is it the fact that you're the second, third, fourth, fifth, or sixth person to do that make it not an abstract idea? Because this claim is not simply computerizing blueprints, Your Honor. It's taking engineering drawings that by themselves cannot be used for manufacturing and turning them into three-dimensional manufacturing blueprints. So one of the things you say in your probe brief is, certainly one could not imagine mentally converting nonstandard fittings to standard fittings in the fashion claimed. Really? A trained engineer couldn't do that if they sat down and worked at it? Using these different criteria from the claims, no, Your Honor. There are simply too many factors here to allow someone with pen and paper to do this conversion in the way the claims talk about. What's your support for that statement, because you don't cite anything? Your Honor, there isn't evidence one way or the other on this, but it's an invalidity challenge, and our position would be that it was Autodesk's burden to come forward with evidence that this could be done by humans. They have nothing in the record to support that proposition. I bet they can imagine it. Your Honor? You said one could not imagine mentally converting it. Well, Your Honor, if their only support is they can imagine it. Well, I want to know what your support is. What's your standard for a person's skill? Your Honor, it would be somebody who has experience in CAD CAM design. So the person that we're talking about is himself skilled, and this is Autodesk's position as well. That person is skilled in the computer arts. They are people who work with computer programs. That person, if that is the person of skill in the art, isn't able to take pen to paper and convert engineering drawings into three-dimensional manufacturing drawings. But that's not what you say. You say you can't imagine mentally converting. Well, Your Honor, going back to the paradigm, what would the person of skill in the art have done? If the person of skill in the art is a skilled person in CAD CAM, this is someone who works with computer software programs, the purpose of which is to generate computer designs, then yes, we would stand by that. There are other human beings with other skills. That's true, Your Honor, but again, when we talk about 101, 102, 103, we're talking about the person of ordinary skill in the art. We're not talking about whether this is an abstract idea. No, I don't think we are. I think you're wrong about that. If the standard is what human practice is, what human beings do, which is what the Supreme Court talks about under 101, then it isn't just a person of skill in the art. But then, Your Honor, it's hard to imagine who the person would be. Would it be absolutely anybody out there, or would it be the person of skill in the art, would it be the average person overall? Would the person off the street be someone who would be involved in this inquiry? Darned if I know, but I'll tell you this. I'm willing to bet you that I could go down to the metal workers' union and find somebody to do it. But again, Your Honor, if this is an invalidity challenge, which it is, then the burden was on Autodesk to come forward with something that shows that this was something that could have been done by humans. Well, let's assume for the moment we reject your position on that, and we find that this is an abstract idea, the first step of Alice. Is there something here that's an inventive step at the second step of Alice? Yes, Your Honor. If we look at the arrangement of the steps for the software, it's obtaining a visual representation and Claim 7 of the 667 patent even further specifies what those visual representations are, and using unique features such as property values, geometric information, and standards information, i.e., the information that allows you to actually build a part instead of just theoretical design of a product. All of those things being used to convert the visual representation into a three-dimensional blueprint that then could be taken by somebody to build an actual system. That is the meat on the bones, if you will, that would convert... in the creation of computerized blueprints. Because the computerized blueprints that the prior art talks about were simply blueprints that sketched out the design of a system like a ventilation system, but they weren't specific enough with the information about parts out there that actually existed that someone could actually take that and build a system. Was there AutoCAD used by people who designed buildings that said this is a standard window? No, Your Honor. When we talk about standards information, we're talking about, for example, a joint between two pieces of duct that actually exists out there. Because when you have someone that's doing an engineering drawing, what you'll have is a very general depiction of a bend in the ventilation system, for example, without concern for whether there's actually a part out there that can be used to make that connection. I've seen cases in the 40 years I've been here, I've seen cases where there were AutoCAD cases where they were referring to standardized parts in other forms of construction. That's why I asked you that question. There may be, well, certainly for the products... I think the reference was to windows, that's why I asked that. Well, certainly since the patents issued, because that's the basis for infringement contention, there are CAD, CAM, AutoCAD programs out there that generate standard-specific designs. So they incorporate the standards information for the various constituent parts of a system. Those are the accused products. But before this patent, no. How is generating standard parts, which just further refines this blueprint program, a technological innovation that improves the operation of the computer or something like that, which is what we said you need to get to UNDERSEP 2? Because using a computer, it is now possible to take a non-standard drawing, a drawing that doesn't allow you to build the system, import information... That doesn't improve the computer, though. That improves the software. It improves the operation of the computer, which is going to generate the blueprint. In other words, in DDR, for example, Your Honor, there wasn't an improvement on the computer, per se. There was an improvement on the interface, which was all software and firmware-based. So it's not like there was a better mousetrap in terms of better hardware in that circumstance. This court said, look... Well, I mean, DDR, to the extent we follow it, is an improvement on the way, at least, things are portrayed on the computer. But yours, I guess... I mean, I guess that's what you're trying to get at. You see, this improves things because it adds details. It doesn't really change anything, though. It just adds details. No, Your Honor. It's a fundamental change in what's displayed. There's now a three-dimensional drawing with fundamentally different... There wasn't three-dimensional drawings before? Not that operated on a computer like this, Your Honor. Not that took a visual representation that can't be used to make a system and was used then to make a system. That's what's displayed... I don't understand what you're saying. I thought it was established that there was computerized preparation of blueprints in the prior art. So what's the improvement? We have to talk about what blueprints we're referring to, Your Honor. The visual representations in the claims, those are engineering blueprints that do not have the standards information that would allow one to manufacture a system. They're basically a two-dimensional, or can be a two-dimensional, very, very simple design. The display on the computer, the thing that enhances the computer operation is that visual representation is taken, and with all this important information that's set forth in 25 lines of claim language, then you convert that into a three-dimensional drawing that can be used to manufacture a system because it has the information about the parts. You know these parts exist. You know what materials they're made out of. You know what their dimensions are. You know that they fit in the space into which they're intended to be deployed.  or the fact that it has the parts? It's both, Your Honor. It's the fact that it's a three-dimensional drawing. It seems to me that people were fairly easily, could manufacture HVAC systems from 2D blueprints by looking at them and then saying, here's what we need for all these things and penciling it in. But that's the thing that's missing, Your Honor. But 3D wasn't new, right? No, but it's not just that it's 3D. That's correct, isn't it? 3D was not new. No, it was not new, Your Honor. But the thing that's different about this is not just that it's a 3D drawing. It's that it is a drawing that can be used to make an entire system because the output shows that the parts exist, what they are, what materials they're made out of, all of the things you need to know beyond what is in your generic blueprint. It still sounds to me an awful lot like automating a bunch of different human steps and putting them together in maybe a new way, but it's not doing anything technological. It's just automating human steps. It sounds to me like a skilled human metalworking foreman could look at that 2D drawing, know what's in the boxes over in the shop, and be able to give the instructions on what to do. But, Your Honor, there's absolutely no evidence of that in the record, and I understand there's no evidence on either part. Right. Well, the evidence in the record that people can take 2D drawings and transform them into 3D HVAC systems is the courthouse you're standing in because there are 3D HVAC systems here. I mean, people have been doing building construction for years, and they start with drawings, and then they figure out from the drawings what the kind of pipes they need to use. But this provides... You put it all together in a very convenient way. That's true, but it seems like that's what Alice says is not patentable, when you automate human steps and turn it into a software program. But then the question becomes, Your Honor, what does it take to improve the operation of a computer to pass muster under Alice? And what we contend is, in this circumstance, the tool that replaces all of this is a better operating computer that allows someone to actually generate the kind of engineering drawings that allows a building like this to be made. Okay, Mr. Summerfield, you're in your rebuttal time. We'll give you 2 minutes. Thank you, Your Honor. Mr. Long? May it please the Court, Robert Long representing Autodesk. Mr. Long, is there anything that tells us what the metalworker does? Yes, Your Honor. In the record at A600 and A601, these are admitted, undisputed statements of material fact. Statement 21, I think, is a nice sort of potted history, a short description of the process that Your Honor should discuss. Yeah, that's fair. Okay. So basically, you know, this happened before there was any AutoCAD. This happened when it was all done with... Yeah, you've answered everything I raised. You start with an architect. An architect does a fairly high-level design. Then an engineer comes in, adds more detail, does a design drawing. And then the way this was done traditionally is the sheet metalworker knew, okay, I've got to build this ventilation system out of particular pieces, standard parts. And the sheet metalworker, as it says here, this is an admitted fact, the sheet metalworker analyzed the design drawing, that's what came from the engineer, and added notes and specifications to create the manufacturing blueprint. That's what these patents create, is the manufacturing blueprint. For example, by choosing standard fittings based on the information present in the design drawing, the analysis inherently took into account geometrical information, such as sizes and locations of fittings, property values, such as materials and airflow, present in the design drawing. And it also took into account standards information by the sheet metalworker's knowledge of what standard fittings were available. So this was done back in the days of paper and pencil. We moved into the computer world, but this basically computerizes that piece of the process. You know, I get that, and I think that's where the case law is, and I agree with you. What troubles me about that is, I don't see a line, and maybe there just isn't a single line, about stopping Alice rejections of software. How do we, I mean, have we essentially made all software ineligible, or is there some line at which the software will fall under step two? I don't think it's made all software ineligible. Well, how do we figure that out? I think if the software, the way I would put it, if the software did something more than simply state an objective, like do this mapping process, if it told you how to implement that objective on a computer in a way that is not simply conventional, generic computer functions, I think that would be a patentable computer software invention. For example, something... How do we know that they didn't do that here? I mean, you have pointed out that this use of standard fittings and converting non-standard to standard was part of the manual process of creating blueprints, but what is there to show that that's not an inventive step here, figuring out how to do it on a computer? Well, I think if you take the Supreme Court's cases and this Court's cases, and you look at all the steps, you know, first there's just data gathering, which doesn't come from the patent. Is your point that it's nothing more than a concept of doing it rather than a method for doing it, a technological solution to the problem? I would say it's a concept for doing it, and the method for doing it on a computer is just a series of utterly routine, conventional computer functions. Indeed, these patents don't tell you anything about how the computer accomplishes these steps, let alone do it in some sort of new, surprising way. It says, take a metal worker and use a computer to imitate him. Yes, essentially, bringing this case down to its elements, yes. And for the first time this morning, I heard sort of a new concept. Maybe the invention here is that the blueprint is something better that we've never had before. Again, I look at another one of the admitted, undisputed facts, number 25 on record, A601. The generating of the asserted claims is a computerized version of making a manufacturing blueprint that the sheet metal worker created manually in the traditional approach. Admitted. That's, I mean, I think that is the fact, but it's for purposes of this case, that is an admitted fact. So the basic process was being done without computers. It is computerized, but there's nothing about the computer process that's anything other than generic computer functions. Indeed, no computer functions are really described. It doesn't tell you how to do it on the computer. It just says it's just a concept. Let's do it on the computer. And that's possibly another way to look at this, Judge Dyke. Some of the cases I've mentioned, you look at how broadly the patent claims. This claims every way of mapping geometrical information and properties onto standard fittings using a computer. I mean, that was one of the Markman issues. So however you do it on a computer, it's claimed. It doesn't tell you how to do it. It doesn't come up with any new innovative way of doing it. And, in fact, it claims every way of doing it using generic functions. So I think that's simply not patentable subject matter under the series of cases that we've had from the Supreme Court and this court. How do you distinguish DDR from this case? Well, I think DDR is distinguishable because, first of all, that was a problem that arose exclusively in the domain of the Internet and computers. You know, what do you do when you're on somebody's webpage and you want to go to some product that's on another webpage, but you want to keep the look and feel of the original webpage? That's, as we've been discussing, this problem of going from the more high-level drawing to the drawing with standardized parts that the workers can actually build. That exact problem existed before computers. And then even in DDR, the court said, look, not every computer-centric patent fits under Section 101. It has to be something that's not simply generic. And they said this was different. This was not the typical way it was done on the Internet. You didn't jump to a new webpage. And, again, here, as I think we've established, the process is the same. The geometrical information is the same. The properties, you know, this is made of galvanized metal. What's the pressure rating? What's the airflow direction? They're all the same properties that we had before, and none of them are really even the patent doesn't purport to be specifying them. And then the blueprint is the same blueprint we had before. That's admitted. That's a fact. So I think, you know, this is really a significantly different case from DDR. And as we were discussing, I don't think affirming the district court here means anything close to software patents are no longer going to be valid. It's just that there is a group of software patents that are not going to be valid under the more recent cases under 101. Are there any further questions? No. Thank you, Mr. Long. Mr. Summerfield, you have two minutes. May it please the Court, I'd like to make two points in rebuttal. Number one has to do with this human activity. What I heard Autodesk say is that no one person is going to be able to do this. In other words, a single person isn't going to be able to take an architectural drawing and create something from which a system can be built. And what we would contend is if it takes two, three, four, five people to do something that the invention claims, that is not a traditional human endeavor. What we believe anyway, Alice and other cases like it, that prohibited patenting. Mr. Summerfield, you said to me in your opening argument that there was no evidence in the record that what sheet metal workers did. Whether it's an individual or a team, the information in the responses to the request for admissions in five and six, that is A600 and 601, directly contradicts what you said to me before. Are you still standing by your prior statement that there's no evidence about what sheet metal workers do? Your Honor, what I understood the court's question to be, and I apologize if I misunderstood it, was whether the person of ordinary skill in the art could do all the steps in claim one. What I just heard from Autodesk is no, you had an architect doing part of them and a sheet metal worker doing another. That's different than saying... Are those ordinary human endeavors? The architect for his and the sheet metal worker for his, yes. The problem here is if we're talking about normal human endeavor, and it starts taking 10, 12, 20, however many people it is to perform what's claimed, that no longer is simply the computerization of a normal human endeavor. Your Honor, it just... And what case says that? Your Honor, there isn't a case that says it. But at some point, to go to Judge Hughes' question, how are we going to prevent all software patents from being invalidated? Because presumably we can figure out a way, getting enough people involved into the mix, to show that everything done by any software package could have been done by humans in the past. Was done by humans in the past. Was done by humans in the past, yes, Your Honor. Was done by humans in the past. Really? Your Honor, at least as I stand here today, I cannot conceive of a computer program that couldn't be performed by humans if you got enough of them with enough skill involved. And I think Autodesk would be hard-pressed to come up with an example as well. The DDR case wasn't... What I was asking you about was one could... Your statement, one could not imagine mentally converting non-standard fittings to standard fittings in the fashion claimed. In the fashion claimed, yes, Your Honor, performing all of these steps. And Autodesk said that a person doesn't do this. A person doesn't do this. It's multiple people that do it. Okay. Thank you, Your Honor. Thank you, Mr. Summerfield. Thank both counsel. The case is submitted.